RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0142p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee,*

    *v.*

MARK GREENO,

                *Defendant-Appellant.*

No. 10-6279

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 1:10-cr-13-9—Curtis L. Collier, Chief District Judge.

Decided and Filed: May 21, 2012

Before: MOORE, GIBBONS, and ALARCÓN, Circuit Judges.[*]

_____

## COUNSEL

_____

**ON BRIEF:** Charles P. Dupree, Chattanooga, Tennessee, for Appellant. Terra L. Bay, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, Luke A. McLaurin, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

_____

## OPINION

_____

    ALARCÓN, Circuit Judge. Defendant-appellant Mark Greeno appeals from the district court's judgment sentencing him to 87 months in prison for conspiracy with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a) and (b)(1)(A). Greeno contends that the district court erred when it applied a dangerous weapon enhancement to his sentence, pursuant to Section 2D1.1(b)(1) of the U.S. Sentencing

_____

[*] The Honorable Arthur L. Alarcón, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

Guidelines.  Greeno also asserts that application of the Section 2D1.1(b)(1) dangerous weapon enhancement violated his Second Amendment right to keep and bear arms.  For the reasons that follow, we affirm the district court.

I.

In May 2009, as part of an ongoing investigation of a methamphetamine trafficking conspiracy in Tennessee and Georgia, law enforcement officers conducted two controlled purchases of methamphetamine at Greeno's property.  Within three days of the second controlled purchase, Officers Eric Allman, Toby Norris, and Dax McGowan executed a search warrant on Greeno's property, which contained a house, a recreational vehicle ("RV"), and a garage.[1]

Officer Norris found a five-shot revolver between the bed and wall of Greeno's RV.  The revolver was near drug paraphernalia, including black electrical tape that was similar to the packaging used on methamphetamine purchased by officers in other controlled purchases.  Officer McGowan searched Greeno's garage and found a handgun in the laundry room.  He also found an unloaded rifle and ammunition in a nearby tool room.  A few yards outside the garage, officers found a canister of methamphetamine buried in the ground.  Officers also found a smaller package of methamphetamine wrapped in black electrical tape outside Greeno's RV.

In January 2010, the Government charged Greeno, along with twenty-three other individuals, with, *inter alia*, conspiracy to distribute at least fifty grams of methamphetamine or at least five hundred grams of a mixture and substance containing methamphetamine in violation of 21 U.S.C. § 841(a) and (b)(1)(A).  A few months later, Greeno pleaded guilty to the conspiracy charge pursuant to a written plea agreement.  The district court dismissed the remaining count against Greeno pursuant to the plea agreement.

---

[1]Greeno lived in the RV during construction on the house.

At Greeno's sentencing hearing, the district court adopted the presentence investigation report and applied the advisory Sentencing Guidelines in determining his sentence. The district court applied a two-level enhancement to Greeno's offense level for possession of a dangerous weapon during a drug offense, pursuant to Section 2D1.1(b)(1) of the U.S. Sentencing Guidelines. The application of this enhancement resulted in an overall offense level of 29, which increased his advisory Guidelines range from 70 to 87 months in prison to 87 to 108 months in prison.

At the sentencing hearing, Greeno objected to the application of the Section 2D1.1(b)(1) dangerous weapon enhancement. He argued that there was insufficient evidence connecting the firearms found on his property with his drug trafficking offense. He also contended that the firearms were for personal protection. In response, the Government presented testimony from Officers Allman, Norris, and McGowan regarding their search of Greeno's property and the controlled methamphetamine purchases conducted at Greeno's home. Greeno's counsel cross-examined the officers, but did not present any evidence at the sentencing hearing.

The district court concluded that the Government had met its burden of showing that Greeno possessed a dangerous weapon during his drug trafficking offense and that Greeno had failed to produce any evidence demonstrating that it was clearly improbable that the weapon was connected to his offense. Thus, the court overruled Greeno's objection to the Section 2D1.1(b)(1) dangerous weapon enhancement and sentenced him to 87 months in prison.

Greeno filed a timely notice of appeal on October 19, 2010, following entry of judgment on October 14, 2010. The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

II.

Greeno contends in this appeal that the district court erred by applying the Section 2D1.1(b)(1) dangerous weapon enhancement to his sentence because the Government did not present sufficient evidence to show that Greeno possessed a firearm

in connection with his drug trafficking offense.  He also maintains that the application of this enhancement violates his Second Amendment right to keep and bear arms.  This Circuit reviews a district court's interpretation of the Sentencing Guidelines *de novo* and its "findings of fact at sentencing for clear error."  *United States v. Baker*, 559 F.3d 443, 448 (6th Cir. 2009).

## A.

Pursuant to Section 2D1.1(b)(1), a two-level enhancement may be added to the base offense level of a defendant convicted of a drug offense "[i]f a dangerous weapon (including a firearm) was possessed."  U.S. Sentencing Guidelines Manual § 2D1.1(b)(1) [hereinafter Sentencing Guidelines].  "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  *Id.* § 2D1.1 cmt. n.3(A).

Under Section 2D1.1(b)(1), the government has the burden of showing "by a preponderance of the evidence that '(1) the defendant actually or constructively 'possessed' the weapon, and (2) such possession was during the commission of the offense.'"  *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)).  This Court has previously recognized that the 1991 amendments to the Sentencing Guidelines removed the requirement that the weapon be possessed *during the commission of the crime*.  *United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003).  "[A]ll that the government need show is that the dangerous weapon [was] possessed during 'relevant conduct.'"  *Id.*

This Court has also recognized that although the Government's burden contains "two separate inquiries, in most instances they collapse into a single factual determination because the weapon was present when the arrest took place or where the crime was committed."  *United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir. 1991), *abrogated on other grounds by United States v. Jackson-Randolph*, 282 F.3d 369 (6th Cir. 2002).  In such "instances, once the government proves a defendant was in possession of a weapon, its burden is satisfied."  *Id.*

Once the government meets its burden, "a [rebuttable] presumption arises that 'the weapon was connected to the offense.'" *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008) (quoting *United States v. Hough*, 276 F.3d 884, 894 (6th Cir. 2002)). The burden then "shifts to the defendant to show that it was 'clearly improbable' that the weapon was connected to the offense." *Catalan*, 499 F.3d at 606. A defendant must present evidence, not mere argument, in order to meet his or her burden. *See Hough*, 276 F.3d at 894 ("[S]peculation is not evidence and does not establish that it was 'clearly improbable' that [the defendant] possessed the firearms during the offense."); *see also Wheaton*, 517 F.3d at 368 ("The bare assertion of Wheaton's counsel that the gun might simply have been for the lawful purpose of defending the residence is insufficient to sustain Wheaton's burden of showing it was 'clearly improbable' that the gun was related to the drug conspiracy.").

This Court considers the following factors, none of which is alone controlling, when determining whether the application of a Section 2D1.1(b)(1) enhancement was appropriate:

> (1) the type of firearm involved; (2) the accessibility of the weapon to the defendant; (3) the presence of ammunition; (4) the proximity of the weapon to illicit drugs, proceeds, or paraphernalia; (5) the defendant's evidence concerning the use of the weapon; and (6) whether the defendant was actually engaged in drug-trafficking, rather than mere manufacturing or possession.

*United States v. Edmonds*, 9 F. App'x 330, 332 (6th Cir. 2001) (citing *United States v. Calhoun*, 49 F.3d 231, 237 (6th Cir. 1995); *United States v. Chalkias*, 971 F.2d 1206, 1217 (6th Cir. 1992); *United States v. McGhee*, 882 F.2d 1095, 1099 (6th Cir. 1989)).

The district court did not err in concluding that the Government presented sufficient evidence to meet its burden. The search was conducted only a few days after the controlled purchase of methamphetamine at Greeno's property. The firearms were found throughout the property in relatively close proximity to drugs and drug paraphernalia. Thus, regardless of where Greeno was on the property, he had ready

access to the firearms.  Greeno does not dispute that he possessed the firearms, nor that the firearms were found on his property during the existence of the drug conspiracy.

Greeno nonetheless contends that the district court erred by applying the Section 2D1.1(b)(1) enhancement because there was no direct evidence showing he possessed a firearm when he sold drugs or that the firearms were found with drugs or drug paraphernalia.  Greeno relies on *United States v. Jock*, 239 F. App'x 126 (6th Cir. 2007), *Baker*, 559 F.3d 443, *United States v. Woods*, 604 F.3d 286 (6th Cir. 2010), and *United States v. Wright*, 426 F. App'x 412 (6th Cir. 2011), to support this contention.

Greeno's reliance on *Jock* is misplaced.  Greeno referred to docket number 06-5595 in citing *Jock*.  That docket number is associated with a Sixth Circuit decision affirming the defendant's resentencing after an earlier remand in 2005.  *Jock*, 239 F. App'x at 127.  To the extent Greeno intended to cite the 2005 decision in *United States v. Jock*, 148 F. App'x 519 (6th Cir. 2005), that decision reversed the district court's sentence because the district court treated the Guidelines as mandatory in violation of *United States v. Booker*, 543 U.S. 220 (2005).  *Jock*, 148 F. App'x at 523-24.  Greeno does not contend there was a *Booker* error in this case.

Greeno's reliance on *Baker* and *Wright* is also misplaced.  Neither case involves a challenge to the sufficiency of the evidence supporting the application of a Section 2D1.1(b)(1) enhancement.  The *Baker* case involves a challenge to a career offender enhancement.  *Baker*, 559 F.3d at 450, 453.  The *Wright* case involves a challenge to the district court's consideration of uncharged crimes when determining a defendant's sentence.  *Wright*, 426 F. App'x at 415-16.  While both decisions reversed and remanded for resentencing, Greeno has not pointed to any portion of either of these decisions that supports his argument in this appeal.

Greeno's reliance on *Woods* is also misplaced.  While the court in *Woods* reversed the district court's application of a Section 2D1.1(b)(1) enhancement, the enhancement was based on possession of a firearm by a co-conspirator.  *Woods*, 604 F.3d at 290-92.  The district court's application of the Section 2D1.1(b)(1) enhancement in this case was not based on possession of a firearm by a co-conspirator.

Greeno did not offer any evidence demonstrating that it was clearly improbable that the firearms were connected to his drug offense and, thus, did not meet his burden. If a defendant fails to meet his or her burden of showing that it was clearly improbable that a firearm was connected to a drug offense, "the district court should apply the enhancement." *Catalan*, 499 F.3d at 606-07. Because Greeno did not meet his burden, the district court did not err when it applied the Section 2D1.1(b)(1) dangerous weapon enhancement to Greeno's sentence.

B.

1.

Although Greeno's articulation of his Second Amendment challenge in his brief is somewhat conclusory and unclear, contrary to the Government's contentions, he did not waive it. This Circuit has recognized that even a "bare bones" argument may survive a waiver challenge. *See United States v. Erpenbeck*, 532 F.3d 423, 434 (6th Cir. 2008) (concluding that a "bare bones" argument raised in a footnote "is not so undeveloped as to constitute a waiver"). Greeno identified the Second Amendment issue in his brief under the header "Issues Presented for Appeal." Greeno also addressed his Second Amendment challenge on pages 12 and 13 of his brief. Moreover, Greeno cited and relied on Supreme Court decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), in support of his challenge.

Greeno's Second Amendment challenge, however, is subject to plain error review because he did not raise it in the district court. A defendant who fails to present an issue to the district court forfeits the benefit of full review, such that appellate review is limited to determining whether the district court committed plain error. *See United States v. Skipper*, 552 F.3d 489, 491 (6th Cir. 2009) ("Skipper did not present this argument to the district court, so our review is limited to determining whether the district court committed plain error.").

Greeno has not cited any portion of the record showing that he raised his Second Amendment challenge in the district court. Based on our review of the transcript from the sentencing hearing, Greeno's counsel referred to the Second Amendment only once: during cross-examination of Officer McGowan. Defense counsel asked Officer McGowan if Greeno "had a good Second Amendment right to own weapons?" to which the officer responded "[y]eah." R. 628 at 49-50. This single question is not enough to raise his Second Amendment challenge because it does not establish a detailed record for review on appeal. Thus, we review for plain error.

2.

On plain error review, we must first determine "whether an error occurred in the district court." *United States v. Thomas*, 11 F.3d 620, 630 (6th Cir. 1993). If we conclude that no error occurred, the "inquiry is at an end." *Id.* In order to determine if an error occurred in the district court in this case, we must determine whether Greeno's Second Amendment right to keep and bear arms, as recognized in *Heller*, was impermissibly restricted by application of the Section 2D1.1(b)(1) enhancement.

a.

The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court held in *Heller* that the Second Amendment protects an individual's right to keep and bear arms without regard to Militia service. *Heller*, 554 U.S. at 595, 598-99. The Court held that the Second Amendment codified the pre-existing right to keep and bear arms. *See id.* at 592 (explaining that "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right"). The core right recognized in *Heller* is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

The Court, however, recognized that the Second Amendment right to keep and bear arms "is not unlimited." *Id.* at 626. For example, the Court recognized the

"historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* at 627 (internal quotation marks omitted). The Court read its prior decision in *United States v. Miller*, 307 U.S. 174 (1939) "to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625.

The Court also recognized that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. The Court declined to define the full scope of the Second Amendment right, but did articulate a non-exhaustive list of presumptively lawful regulations:

> [N]othing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 626-27, 627 n.26.

Because the list contains the prohibition on the possession of firearms by felons, this Circuit has relied on it to reject Second Amendment challenges to federal felon-in-possession of a firearm convictions and related expungement exceptions. *See, e.g.*, *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010) ("In short, *Heller* states that the Second Amendment right is not unlimited, and in fact, it is specifically *limited* in the case of felon prohibitions. Because Congress's prohibition on felon possession of firearms is constitutional, it follows that the burdens associated with the congressionally-created expungement exception in 18 U.S.C. § 921(a)(20) do not violate the Second Amendment." (citation omitted)); *United States v. Whisnant*, 391 F. App'x 426, 430 (6th Cir. 2010) (relying on *Carey* and rejecting Second Amendment challenge to felon in possession of firearm conviction).

Because the list does not contain the Section 2D1.1(b)(1) dangerous weapon enhancement at issue in this case, we cannot rely on the list, alone, to reject Greeno's

Second Amendment challenge. *See United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) ("Some courts have treated *Heller*'s listing of 'presumptively lawful regulatory measures,' for all practical purposes, as a kind of 'safe harbor' for unlisted regulatory measures, such as 18 U.S.C. § 922(g)(9), which they deem to be analogous to those measures specifically listed in *Heller*. . . This approach, however, approximates rational-basis review, which has been rejected by *Heller*." (citation omitted)).

This Circuit has not yet reached the merits of a post-*Heller* Second Amendment challenge to a Section 2D1.1(b)(1) dangerous weapon enhancement in a published decision. *See United States v. Walker*, 351 F. App'x 16, 18 (6th Cir. 2009) (declining to reach the merits of the defendant's post-*Heller* Second Amendment challenge to a Section 2D1.1(b)(1) enhancement because the defendant waived the challenge by accepting the enhancement in his plea agreement); *United States v. Hurley*, 278 F. App'x 574, 576 (6th Cir. 2008) (declining to reach the merits of the defendant's post-*Heller* Second Amendment challenge to a Section 2D1.1(b)(1) enhancement because the defendant waived the challenge by failing to develop the argument in his brief).

b.

Since the Supreme Court's decision in *Heller*, courts have wrestled with its text to develop a sound approach to resolving Second Amendment challenges. Several circuits have adopted a two-pronged approach. *See United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) ("As we read *Heller*, it suggests a two-pronged approach to Second Amendment challenges."); *Chester*, 628 F.3d at 680 (applying two-pronged approach); *Ezell v. City of Chicago*, 651 F.3d 684, 701-03 (7th Cir. 2011) (same); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010) (same).

Under the first prong, the court asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood. *Chester*, 628 F.3d at 680. As the Seventh Circuit recognized, "*Heller* suggests that some federal gun laws will survive Second Amendment challenge because they regulate activity falling outside the terms of the right as publicly understood when the Bill of Rights was ratified." *Ezell*, 651 F.3d at 702. If the Government demonstrates that the

challenged statute "regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment--1791 [Bill of Rights ratification] or 1868 [Fourteenth Amendment ratification]--then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id.* at 702-03.

"If the government cannot establish this--if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected-- then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* at 703. Under this prong, the court applies the appropriate level of scrutiny. *Marzzarella*, 614 F.3d at 89. If the law satisfies the applicable standard, it is constitutional. *Id.* If it does not, "it is invalid." *Id.*

We find this two-pronged approach appropriate and, thus, adopt it in this Circuit. Under the first prong, we must determine whether the Section 2D1.1(b)(1) enhancement burdens conduct that falls within the scope of the Second Amendment right as historically understood. If the enhancement falls outside the scope of the Second Amendment right as historically understood, the possession of a weapon during a drug offense is unprotected and our inquiry ends.

According to *Heller*, the Second Amendment right as historically understood protects the right of individuals to keep and bear arms for self-defense. *Heller*, 554 U.S. at 628. As stated above, the core right recognized in *Heller* is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Since the Second Amendment recognized the pre-existing right to keep and bear arms, we look to early restrictions on the possession and use of weapons.

As a preliminary matter, we acknowledge that the Section 2D1.1(b)(1) enhancement, as well as laws prohibiting the possession, use, and distribution of narcotics are of relatively recent vintage. The Section 2D1.1(b)(1) enhancement was first introduced in 1987. Sentencing Guidelines § 2D1.1(b)(1) (1987). State laws prohibiting the sale of certain narcotics were first introduced in the late Nineteenth

Century.  *See* Margarita Mercado Echegaray, *Drug Prohibition in America: Federal Drug Policy and its Consequences*, 75 Rev. Jur. U.P.R. 1215, 1219 (2006) ("In light of widespread use during the nineteenth century, states enacted legislation to curb drug use in America."); *see, e.g.*, *In re Ah Lung*, 45 F. 684, 685 (N.D. Cal. 1891) (discussing San Francisco city ordinance prohibiting sale, gift, or delivery of opium or morphine); *Luck v. Sears*, 29 Or. 421, 423 (Or. 1896) (discussing 1887 state statute prohibiting the sale and gift of opium, morphine, and other substances).  While earlier federal drug-related laws involved labeling and taxation, the first comprehensive federal drug law targeting drug trafficking was enacted in 1970 in the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236.  *See Gonzales v. Raich*, 545 U.S. 1, 10 (2005) (discussing federal drug regulations).

The mere fact that drug laws and the Section 2D1.1(b)(1) enhancement were not enacted until recently does not automatically render the possession of weapons by drug traffickers within the scope of the Second Amendment right as historically understood. Nothing in *Heller* suggests such a static reading of the Second Amendment.  Thus, we look to the broader question of whether the Second Amendment right, as historically understood, protected the possession of weapons by individuals engaged in criminal activity.

At common law, the right to keep and bear arms was not unlimited.  For example, there was a historical tradition prohibiting the possession of dangerous or unusual weapons.  *Heller*, 554 U.S. at 627; *see State v. Hirsch*, 338 Or. 622, 676 (Or. 2005) (discussing common law right to keep and bear arms and that "[n]othing in the history of the English right suggests that the drafters of the English Bill of Rights intended the arms provision to preclude the disarmament of serious lawbreakers"); *see, e.g.*, *State v. Huntly*, 3 Ired. 418, 418 (N.C. 1843) (discussing the common law history of the offense of riding or going armed with dangerous or unusual weapons, to the terror of the people).

In the Eighteenth and Nineteenth Centuries, numerous states separately penalized, or increased the severity of punishment for, crimes committed by individuals who used a weapon during the commission of a crime.  *See* Saul Cornell & Nathan

DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 501 (2004) (discussing history of right to keep and bear arms and explaining that, in the Founding Era, "justices of the peace, sheriffs, and constables were empowered to disarm individuals who ride about armed in terror of the peace"); *see, e.g.*, *State v. O'Neil*, 71 Minn. 399, 401 (Minn. 1898) (discussing Minnesota statute that classified a robbery committed by a person armed with a dangerous weapon as first degree robbery); *People v. Rockhill*, 26 N.Y.S. 222, 223-24 (N.Y. 1893) (discussing New York statute defining first degree assault as including assaults with intent to kill by a person with a loaded firearm or other deadly weapon)*; State v. Cash*, 16 P. 144, 145 (Kan. 1887) (discussing Kansas statute characterizing first degree burglary as committed by a person who, *inter alia*, is armed with a dangerous weapon); *State v. Tutt*, 63 Mo. 595, 599 (Mo. 1876) (discussing Missouri statute defining first degree burglary as the breaking into a dwelling house with the intent to commit a felony with, *inter alia*, a dangerous weapon); *Commonwealth v. Hope*, 39 Mass. 1, 9-10, 22 Pick. 1 (Mass. 1839) (discussing 1805 Massachusetts statute dividing the offense of burglary and explaining that the use of a dangerous weapon during a nighttime burglary was punishable by death); *United States v. Bernard*, 24 F. Cas. 1131, 1131, 2 Wheeler C.C. XLIV (N.J. 1819) (stating that New Jersey's prohibition on the use of a dangerous weapon to rob a postal carrier was a capital offense).

Consistent with the historical understanding of the right to keep and bear arms, several courts, including the Supreme Court in *Heller*, have recognized that the right to keep and bear arms is for *lawful purposes*. *See Heller*, 554 U.S. at 625 (reading the *Miller* decision as providing that the "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes"); *Huntly*, 3 Ired. at 423 (discussing common law offense of "riding or going about armed with unusual and dangerous weapons" and stating that "[f]or any lawful purpose--either of business or amusement-- the citizen is at perfect liberty to carry his gun. It is the wicked purpose-- and the mischievous result--which essentially constitute the crime"); *see generally Andrews v. State*, 50 Tenn. 165, 196 (Tenn. 1871) (Nelson, J., concurring)

("Neither the old nor the new Constitution confers the right to keep, or to bear, or to wear arms, for the purpose of aggression.").

By penalizing weapon possession during a drug offense, the Section 2D1.1(b)(1) enhancement is consistent with the historical understanding of the right to keep and bear arms, which did not extend to possession of weapons for unlawful purposes. To hold the contrary would suggest that the Second Amendment protects an individual's right to possess a weapon for criminal purposes. Nothing in *Heller*, the common law, or early case law suggests such a reading.

The Section 2D1.1(b)(1) enhancement, like other historical restrictions on the possession and use of weapons, punishes an individual who possesses a dangerous weapon for an unlawful purpose and, thus, it falls outside the scope of the Second Amendment right. The enhancement "reflects the increased danger of violence when drug traffickers possess weapons." Sentencing Guidelines § 2D1.1(b)(1) cmt. n.3(A). Greeno did not rebut the presumption that the firearms were connected to his drug trafficking offense; he did not establish he possessed the firearms for a lawful purpose.

Because the conduct regulated by the Section 2D1.1(b)(1) enhancement falls outside the scope of the Second Amendment right as historically understood, Greeno's Second Amendment challenge fails.[2]

c.

At least one circuit court has suggested that even if the regulated activity presumably falls outside the scope of the Second Amendment right, a regulation may still be subject to an as-applied challenge. *See United States v. Barton*, 633 F.3d 168, 172-73 (3d Cir. 2011) (explaining that "*Heller*'s statement regarding the presumptive validity of felon gun dispossession statutes does not foreclose Barton's as-applied

---

[2]Since Greeno's challenge does not survive the first prong of the two-pronged approach, we need not decide the appropriate level of scrutiny to apply to post-*Heller* Second Amendment challenges under the second prong.

challenge" because by describing the statute as "presumptively" lawful, "the Supreme Court implied that the presumption may be rebutted").

To the extent Greeno raises such a challenge, it fails.  Greeno has not cited any authority suggesting that the enhancement as applied to him is an unacceptable restriction on his Second Amendment right or that he falls outside the intended scope of the enhancement.  As we previously discussed in Section II.A., the Government presented evidence showing that officers found three firearms in Greeno's home in relatively close proximity to drugs and drug paraphernalia and within days of a controlled purchase of methamphetamine at Greeno's home.  The district court relied on this evidence to conclude that the Government met its burden of showing that Greeno possessed a firearm in connection with his drug offense.  Greeno did not present any evidence to the district court showing that he used the firearms for a lawful purpose or that the connection between the firearms and the drug offense was clearly improbable.

III.

For the foregoing reasons, we affirm.