RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0038p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAYMON DOUG RISNER,

*Defendant-Appellant*.

No. 24-5394

─────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 7:22-cr-00022-2—Robert E. Wier, District Judge.

Decided and Filed:  February 21, 2025

Before:  THAPAR, NALBANDIAN, and DAVIS, Circuit Judges.

─────────────

**COUNSEL**

**ON BRIEF:**  Sebastian M. Joy, JOY LAW OFFICE, Catlettsburg, Kentucky, for Appellant.
Charles P. Wisdom, Jr., Amanda Harris Huang, UNITED STATES ATTORNEY'S OFFICE,
Lexington, Kentucky, for Appellee.

DAVIS, J., delivered the opinion of the court in which THAPAR and NALBANDIAN,
JJ., concurred.  THAPAR, J. (pp. 10–11) delivered a separate concurring opinion.

─────────────

**OPINION**

─────────────

DAVIS, Circuit Judge.  A federal grand jury charged Defendant Raymon Risner with
several drug trafficking and firearms offenses.  Risner moved to dismiss the firearm-related
counts, arguing that the charging statutes violate the Second Amendment.  The district court
denied Risner's motion, and Risner pleaded guilty to conspiracy to distribute methamphetamine

and possessing a firearm in furtherance of a drug trafficking offense.  As part of the plea agreement, Risner retained the right to appeal the district court's denial of his motion to dismiss and filed this timely appeal.  To the extent of our jurisdiction, as discussed herein, we AFFIRM.

I.

Between January and November 2022, Risner conspired with two other individuals to distribute methamphetamine in Knott County, Kentucky.  Using a confidential informant, the Kentucky State Police conducted several controlled buys of methamphetamine from Risner.  A video from a July 2022 transaction inside Risner's home showed Risner sitting next to a coffee table with a pistol on it.  Months later, when federal agents executed a search warrant at Risner's residence, they seized a pistol, $523 in cash, a digital scale, and cell phones.

Risner and two co-conspirators faced a ten-count indictment.  Risner moved to dismiss counts two and ten—which charged him with possessing a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A) and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), respectively.  As grounds for dismissal, Risner asserted that applying the analytical framework announced in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022) renders each statute facially unconstitutional.  The district court concluded that neither statute offends the Second Amendment and denied Risner's motion.

Risner later agreed to plead guilty to counts one and two of the indictment.  These counts charged respectively: conspiracy to distribute fifty grams or more of a mixture or substance containing a detectable amount of methamphetamine; and possession of a firearm in furtherance of a drug trafficking offense.  The district court dismissed the felon-in-possession charge pursuant to the plea agreement.  Risner timely appealed.

II.

We review de novo Risner's challenges to the constitutionality of § 922(g)(1) and § 924(c)(1)(A).  *United States v. Loney*, 331 F.3d 516, 524 (6th Cir. 2003).  On appeal, Risner asserts facial and as-applied challenges to both statutes.  But because Risner's plea agreement

"specifically limited" his right to appeal to the question of "whether the District Court erred when it denied [his] facial challenge[s]" to those statutes, (R. 105, PageID 357, ⁋ 1), we consider only his facial challenges. He does not challenge the validity of his appeal waiver, so we honor its terms here. *See United States v. Toth*, 668 F.3d 374, 377 (6th Cir. 2012) ("[A] defendant may waive any right. . . by means of a plea agreement. Only challenges to the validity of the waiver itself will be entertained on appeal." (citation and internal quotation marks omitted)).[1] Risner faces a heavy burden because he must "establish that no set of circumstances exists under which [either statute] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "Thus, the government will prevail if it can show that the provisions are 'constitutional in some of [their] applications.'" *United States v. Gore*, 118 F.4th 808, 811 (6th Cir. 2024) (alteration in original) (quoting *Rahimi*, 602 U.S. at 693).

## III.

### A.

Risner spends the bulk of his briefing explaining why the felon-in-possession statute, 18 U.S.C. § 922(g)(1), violates the Second Amendment. But, as discussed, the government voluntarily dismissed Risner's felon-in-possession charge. The government does not raise this dismissal as a bar to our review. But we have an "independent obligation to ensure that [we] do not exceed the scope of [our] jurisdiction," so we must consider whether Risner has standing to raise his constitutional challenge to § 922(g)(1). *Chevalier v. Est. of Barnhart*, 803 F.3d 789, 794 (6th Cir. 2015) (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)). And here there is reason to doubt his Article III standing.

A criminal defendant has standing to appeal the dismissal of a charge against him where he "retains the necessary personal stake in the appeal." *See United States v. Bergrin*, 885 F.3d 416, 419–20 (6th Cir. 2018) (quoting *Camreta v. Greene*, 563 U.S. 692, 702 (2011)). To be sure,

---

[1]Even if Risner had not agreed to limit his appeal as part of the plea agreement, his as-applied challenges would have been subject to forfeiture because of his failure to raise the issues before the district court. *See United States v. Garner*, 491 F.3d 532, 535 (6th Cir. 2007) (citing *United States v. Humphrey*, 287 F.3d 422, 430 (6th Cir. 2002)).

a criminal defendant does not automatically lose such a personal stake when charges against him are dismissed. For instance, in *Bergrin* we found that the defendant retained a necessary stake even though the court had dismissed all charges brought against him after adjudging him mentally ill. Under those circumstances Bergrin was, nevertheless, entitled to challenge the dismissed charges because the "collateral consequences" of that judgment—a finding that he was "mental[ly] disease[d]"—could be eliminated if it were reversed. *Id.* at 420 (alteration in original) (internal quotation marks omitted).

By contrast, we have held that civil plaintiffs lost their personal stake in the litigation after they settled and dismissed all claims against the defendants, rendering their case moot, because "the plaintiffs no longer had a personal stake. . . in the outcome of the litigation." *See Pettrey v. Enter. Title Agency, Inc.*, 584 F.3d 701, 703 (6th Cir. 2009). We see no collateral consequences resulting from the government's dismissal of Risner's § 922(g)(1) charge that may afflict him should he be unable to advance his constitutional challenge to that statute. With the claim dismissed, Risner's challenge would have no bearing on his guilty plea; it would do nothing to change "the outcome of the litigation." *Id.* And we have no reason to believe that Risner will be recharged here under § 922(g)(1). *Cf. Murphy v. Hunt*, 455 U.S. 478, 484 (1982) (per curiam). As such, Risner no longer has a "personal stake" in § 922(g)(1)'s constitutionality, and he lacks standing to challenge it. *Bergrin*, 885 F.3d at 419 (internal quotation marks omitted); *cf. United States v. Sanchez-Gomez*, 584 U.S. 381, 384–86 (2018) (holding as moot four defendants' constitutional challenges to policy of holding defendants in "full restraints" for nonjury proceedings after defendants either pleaded guilty or had charges dismissed).

Moreover, we determined in *United States v. Williams* that § 922(g)(1) "is constitutional on its face." 113 F.4th 637, 662 (6th Cir. 2024). Therefore, even if Risner has standing, his challenge would fail.

B.

Risner's Second Amendment challenge to 18 U.S.C. § 924(c)(1)(A) fares no better. That statute prohibits using a weapon "during and in relation to any crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1)(A). Unlike § 922(g)(1), we have not considered the

merits of a post-*Bruen* Second Amendment challenge to § 924(c)(1)(A)'s constitutionality in a published decision. *United States v. Burgess*, Nos. 22-1110/22-1112, 2023 WL 179886, at *5 (6th Cir. Jan. 13, 2023); *United States v. Wellington*, No. 24-3151, 2024 WL 4977138, at *2 (6th Cir. Dec. 4, 2024). As it regards Risner, he admits that he engaged in a drug-trafficking crime but argues that the fact that § 924(c)(1)(A) "can only trace its roots back [f]ifty-five years is prima facie evidence" of its inconsistency with the history and tradition of firearms regulation in this nation. (ECF 8, Appellant's Br. 30). We, therefore, examine whether § 924(c)(1)(A)'s restriction on using a firearm in furtherance of a drug trafficking crime is consistent with "the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court found that the Second Amendment codified a pre-existing "individual right to keep and bear arms." 554 U.S. 570, 595 (2008). The Court acknowledged, however, that this "right was not unlimited." *Id.* Rather, the Second Amendment "protects the ability to keep, for 'lawful purposes,' the kinds of weapons in common usage, like those used for self-defense." *Williams*, 113 F.4th at 643 (quoting *Heller*, 554 U.S. at 625, 627).

After *Heller*, we adopted a two-step test to analyze the constitutionality of laws that deprive any individual of the right to keep and bear arms. *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012), *abrogated on other grounds by Bruen*, 597 U.S. at 19. Under *Greeno*'s framework, we first asked whether the government justified the challenged regulation by showing that it reached conduct not within the Second Amendment's scope. And we ascertained this by looking to historical evidence. *Id.* If the government failed there—meaning the challenged regulation reached conduct that was historically within the Second Amendment's sphere of protection—then we evaluated the strength of the government's interest for restricting the right. *Id. Bruen* overruled this test, finding it had "one step too many." 597 U.S. at 19. In its place, *Bruen* essentially broke down *Greeno*'s first step into two parts: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is

consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. To determine whether such consistency exists, we "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692 (alteration in original) (quoting *Bruen*, 597 U.S. at 29 n.7). Thus, as with our prior approach under *Greeno*'s step one, if the government can either (1) prove that the Second Amendment's text does not reach the regulated conduct or (2) locate a historical analog to justify the challenged regulation, Risner's challenge fails. *See Gore*, 118 F.4th at 812.

Risner argues, based on the Second Amendment's text and history, that (1) he is a member of "the people" afforded the Second Amendment's protections, and (2) § 924(c)(1)(A) is not consistent with the Nation's history of firearm regulation because the statute can only trace its roots back fifty-five years. But whether he is a member of "the people" protected by the Constitution is somewhat beside the point because we have already determined—regardless of one's status as a member of "the people"—that the "historical understanding" of the Second Amendment right "did not extend to possession of weapons for unlawful purposes." *Greeno*, 679 F.3d at 520.

In evaluating a Second Amendment challenge to Section 2D1.1(b)(1)[2] of the U.S. Sentencing Guidelines in *Greeno*, we started and ended our analysis with the inquiry later embraced by *Bruen*. *Id.* Specifically, we asked "whether the challenged law burdens *conduct* that falls within the scope of the Second Amendment right, as historically understood." *Id.* at 518 (emphasis added). And to answer this question, we "examine[d] our 'historical tradition of firearm regulation' to help delineate the contours of the right," as *Bruen* would later instruct future courts to do. *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 17).

---

[2]A Section 2D1.1(b)(1) enhancement may apply when a defendant possesses a firearm during a drug offense. *See* U.S.S.G. § 2D1.1(b)(1). Section 924(c)(1)(A) criminalizes the use of a firearm during a drug trafficking crime. 18 U.S.C. § 924(c)(1)(A). Because both laws effectively restrict an individual's use of a firearm during the same substantive conduct, *Greeno*'s historical analysis of the constitutionality of Section 2D1.1(b)(1) answers the same question before us regarding § 924(c)(1)(A)'s constitutionality, at least as it pertains to the use of a firearm during a drug trafficking offense.

Before launching into a historical analysis, we effectively rejected an argument similar to Risner's recency-of-§ 924(c)(1)(A) argument when we observed that "[t]he mere fact that drug laws and the Section 2D1.1(b)(1) enhancement were not enacted until recently does not automatically render the possession of weapons by drug traffickers within the scope of the Second Amendment right as historically understood." *Greeno*, 679 F.3d at 519. Rather than framing our historical inquiry around Section 2D1.1(b)(1)'s age, we focused on whether the Second Amendment's right "protected the possession of weapons by individuals engaged in criminal activity." *Id.*

We began our historical survey at common law, where we found "a historical tradition [of] prohibiting the possession of dangerous and unusual weapons," which often included disarming "serious lawbreakers" or forbidding going armed with such weapons "to the terror of the people." *Id.* (citing *State v. Hirsch*, 114 P.3d 1104 (Or. 2005) (discussing common law right to keep and bear arms); *State v. Huntly*, 3 Ired. 418, 418 (N.C. 1843)). We then moved to the laws of the states in the eighteenth and nineteenth centuries, many of which included increased penalties for "us[ing] a weapon during the commission of a crime." *Id.* at 519–20 (collecting founding era cases and statutes). From these examples, we concluded that the historical understanding of the right to keep and bear arms included only the right to do so for "lawful purposes." *Id.* at 520 (emphasis omitted). Because Section 2D1.1(b)(1)'s sentencing enhancement applied to individuals who possessed a firearm while engaged in drug trafficking, we concluded that the regulated conduct was not within the Second Amendment's scope. *Id.* at 521. *Greeno*'s challenge, therefore, failed at step one, and our inquiry ended there.

Under *Bruen*, we analyze Risner's § 924(c)(1)(A) challenge just as we analyzed *Greeno*'s challenge to Section 2D1.1(b)(1). Applying this analytical framework will "often involve reasoning by analogy" while focusing on relevant comparative metrics like "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 28–29. In applying its new framework to assess the constitutionality of New York's may-issue licensing regime in *Bruen*, the Court examined the parties' proposed analogies of New York's statutory scheme to English, common-law, pre-ratification, and post-ratification historical practice. *Id.* at 36–70.

The Court subsequently recognized in *Rahimi* that using the referenced "[w]hy and how" comparative metrics to search for a historical analog that similarly restricted firearm possession is the central goal of *Bruen*'s test. *Rahimi*, 602 U.S. at 692. So, rather than searching for a "historical twin" to the challenged law in *Rahimi*, the Court credited as historical analogs laws showing that "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Id.* at 693. Finding sufficient historical support, the Court concluded that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others," so § 922(g)(8)(c)(i) lawfully applied to Rahimi, who had been disarmed based on a domestic violence restraining order. *Id.* at 700.

The methodology employed by the Court in both *Bruen* and *Rahimi* demonstrates the Court's embrace of the first step of our prior two-step approach as the proper Second Amendment inquiry. *See Bruen*, 597 U.S. at 19. Because we started and stopped our inquiry at step one of the prior test in *Greeno*, nothing in *Bruen* dictates a different approach here. *See Burgess*, 2023 WL 179886, at *5 (observing that *Bruen* did not disturb *Greeno*'s holding). Therefore, we have no reason to depart from *Greeno*'s holding that the historical understanding of the right to keep and bear arms does not extend to the use of a firearm for an unlawful purpose. *Cf. Williams*, 113 F.4th at 645–46 (departing from prior precedent where *Bruen* mandated a different mode of analysis).

Because § 924(c)(1)(A) expressly prohibits the use of a firearm during the commission of a drug trafficking crime—an objectively unlawful purpose—and Risner admits to possessing a firearm in connection with drug trafficking, § 924(c)(1)(A) lawfully applies to Risner. And beyond being unlawful, we have also identified drug trafficking as dangerous. *See id.* at 659. Risner's admission that he possessed a firearm "to protect himself from the dangers associated with drug trafficking," lends credence to this notion. (R. 105, PageID 359, ₽ 3(c)). Importantly, our "nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous." *Williams*, 113 F.4th at 657. It is not a far stretch to conclude that one who must arm himself due to the very danger of the crime in which he is involved is, by virtue of that fact, also dangerous. Thus, from this perspective also, § 924(c)(1)(A)'s prohibition against

possessing a firearm in furtherance of a drug trafficking crime fits comfortably within the history and tradition of gun regulation in this country. Risner, therefore, cannot demonstrate that § 924(c)(1)(A) is unconstitutional in every application—a requirement to mount a successful facial challenge to the statute.

IV.

We AFFIRM.

————————————

**CONCURRENCE**

————————————

THAPAR, Circuit Judge, concurring.  It's no surprise that our laws have long prohibited criminals from carrying guns in service of their crimes.  After all, as John Jay put it, "[a]mong the many objects to which a wise and free people find it necessary to direct their attention, that of providing for their safety seems to be the first."  *The Federalist* No. 3, at 10 (John Jay) (Clinton Rossiter ed., 1961).  The Second Amendment doesn't stand in the way of that commonsense conclusion.

Nevertheless, Risner brings a facial challenge to 18 U.S.C. § 924(c)(1)(A), which bans using or carrying a firearm while committing a violent crime or trafficking drugs.  A facial challenge is the "most difficult challenge to mount successfully" because it requires a defendant to "establish that no set of circumstances exists under which the Act would be valid."  *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  I join the majority's thoughtful opinion concluding that Risner's challenge fails.  I do so because American history provides many examples of similar valid laws.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  This Amendment codifies a core right: "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).  Anytime the government tries to infringe on that right, we ask the government to show that the restriction squares with our country's historical tradition of firearm regulation.  *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022).

This country has a long tradition of preventing criminals from using guns when they commit crimes.  Indeed, one important early American treatise, the *Conductor Generalis*, described how police could disarm individuals who committed the crime of "affray" while armed.  An affray was the common law offense of inflicting "terror" on the people.  *The Conductor Generalis: Or the Office, Duty and Authority of Justices of the Peace, High-Sheriffs,*

*Under-Sheriffs, Coroners, Constables, Gaolers, Jury-men, and Overseers of the Poor* 10 (New York, Hugh Gaine 1788). Similarly, a federal circuit court in 1819 recognized Congress' prohibition on using a dangerous weapon to rob a postal carrier. *United States v. Bernard*, 24 F. Cas. 1131, 1131 (C.C.D.N.J. 1819) (No. 14,584). There are plenty of other historical examples of governments prohibiting the carrying of firearms during the commission of crimes. *See, e.g.*, *Commonwealth v. Hope*, 39 Mass. 1, 9–10 (1839) (noting 1805 Massachusetts statute that made burglary with use of a dangerous weapon during nighttime punishable by death); *People v. Fellinger*, 24 How. Pr. 341, 342 (Ny. Gen. Term 1862) (criminalizing breaking and entering while "armed with a dangerous weapon"); *State v. Tutt*, 63 Mo. 595, 599 (1876) (similar). All told, the history teaches a simple lesson: the government has long been able to punish individuals for using guns when they commit crimes.

Thus, Risner's facial challenge fails. He can't overcome America's tradition of criminalizing the use of a gun to commit a crime. Section 924(c)(1)(A)'s prohibition on using or carrying a firearm while committing a crime of violence or drug trafficking crime doesn't depart from that historical practice.

In reaching this conclusion, the majority relies on *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012), *abrogated by Bruen*, 597 U.S. at 1. There, this court set out a two-prong test for evaluating restrictions on citizens' rights. *See id.* The first prong, which is consistent with *Bruen*, considered whether a restriction fell within our nation's historical tradition of firearm regulation. *Id.* As the majority correctly points out, its second prong, which balanced the right to carry a firearm with government interests, is no longer good law. *See id.*; *Bruen*, 597 U.S. at 24. Since *Greeno*'s first step mirrors the analysis *Bruen* requires, I concur.